## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **DEMETRIUS BAILEY,** | : | **CIVIL NO. 3:CV-06-1707** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Demetrius Bailey, ("Plaintiff"), an inmate incarcerated at the State

Correctional Institution at Frackville (SCI-Frackville) during the relevant time period,

commenced this civil rights action on August 31, 2006.  He is proceeding *via* a second

amended complaint.  (Doc. 13.)  Presently pending is a motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56, filed on behalf of Defendants Kane, Beach,

Durant, Najarro, Kintzel, Yurkiewicz, Greco, Alshefski, Sherriff, Lorady and Toner

("Corrections Defendants").[1]  (Doc. 38.)  The motion is ripe for disposition.  For the reasons

set forth below, the motion will be granted.

### I.      Statement of Facts

On December 28, 2004, in accordance with Pennsylvania Department of Corrections

("DOC") Administrative Directive 803 ("DC-ADM-803"), Section D, Security, the

Superintendent of SCI-Frackville, Robert Shannon, requested permission from the Deputy

---

[1]Two motions to dismiss pursuant to Federal Rule of Civil Procedure 12, filed on behalf of Defendants Cori and Malec, and Nahas (Docs. 52, 67), have been addressed in a separate Memorandum and Order.

Secretary of the DOC, Donald Vaughn, to monitor and photocopy the non-privileged

correspondence of Plaintiff because "[t]he Security Office has received intelligence that

inmate CP-7819 Demetrius Bailey is planning the introduction of contraband drugs into SCI

Frackville." (December 28, 2004 Request, Doc. 41, at 25.)  DC-ADM 803, provides that:

> Incoming and outgoing correspondence, other than privileged correspondence,
> may be read upon the written order of the Regional Deputy Secretary and
> reproduced upon written order of the respective Regional Deputy Secretary only
> when there is reason to believe that the security of the facility may be threatened,
> that this directive is being violated, or there is evidence of criminal activity or of
> a misconduct offense.  In those cases where the Regional Deputy Secretary's
> approval is required, a request must be made in writing every 30 days for a
> continued reproduction

DC-ADM 803, Inmate Mail and Incoming Publications Policy, Section VI(D)(1)(c)

(effective July 15, 2004).  The request was approved by the Deputy Secretary the following

day.  (Id.)  Shortly thereafter, on January 4, 2005 a letter that was sent by Plaintiff to an

individual in McKeesport, Pennsylvania, was intercepted because prison officials believed

that the letter contained statements that indicated that Plaintiff was seeking to have illegal

drugs introduced into the institution.  (Doc. 41, at 6.)

    *A.*    *January 14, 2005 Misconduct*

On January 14, 2005, the security office at SCI-Frackville received intelligence that

contraband drugs were smuggled into the institution on January 9, 2005, by inmate Lyons

and being sold by Plaintiff.  (Extraordinary Occurrence Report, Doc. 41, at 9.)  The K-9 unit

was brought in to assist with the investigation.  An Extraordinary Occurrence Report was

generated and stated as follows:

2

> During the Search of CP-7819 Bailey cell, the K-9 Jake alerted on CP-7819 Bailey's bed. During the Search, CP-7819 Bailey was becoming agitated. COI Kintzel ordered CP-7819 Bailey to be handcuffed for staff safety. CP-7819 Bailey refused stating, 'You are going to do it my way' and took a boxing stance and was dancing around to strike at staff. K-9 Officer, COII Yurkiewicz, utilized a Control Technique, the Rea, by striking CP-7819 Bailey's right knee, knocking him off balance. COI's Beach, Alshefski, Kintzel, Hughes, COI Greco and COII Yurkiewicz took control of CP-7819 Bailey and placed him on the floor. CP-7819 Bailey was handcuffed. CP-7819 Bailey assaulted COI Kintzel by kicking his left leg while he was on the ground. CP-7819 Bailey was escorted form [sic] the Housing Unit. CP-7819 Bailey was escorted off the Block by COI Kintzel and by COI Alshefski to the Property Room Holding Cell. CP-7819 Bailey was then escorted by COIII Avezzano, COI's Bowers and McCormick to SCIF Medical Department and to the RHU.
>
> CP-7819 Bailey was issued Misconduct #A651058 for Class #1, Charges; 1A1, 'Assault' and 1B, # 35, 'Refusing to Obey an Order.' CP-7819 Bailey was placed in the RHU, EA-07, AC Temp Status.

(Doc. 41, at pp. 9-10.) He was also issued Misconduct #A648152 for possession of contraband in the form of two pieces of copper wire. (Misconduct Report, Doc. 41, at 26.)

Defendant Kintzel described the incident in the misconduct report, stating that during the course of the search, the K-9 alerted "on several pieces of inmate Bailey's clothing and bed" which resulted in Bailey being strip-searched. (Misconduct Report, Doc. 41 at 11.) Following the strip-search, he became agitated. He was ordered to turn around to be handcuffed. He refused and began yelling. In an attempt to control Bailey, he was placed on the ground. While on the ground, Plaintiff kicked him in the leg. (Id.)

Defendant Yurkiewicz also stated that, because Plaintiff was becoming agitated during the course of the search, for the safety of the staff, Defendant Kintzel informed Plaintiff that he was going to be placed in handcuffs. (Employee Report of Incident, Doc.

3

41, at 12.)  Plaintiff refused many orders to "cuff up" and was becoming increasingly
agitated.  He began moving into an aggressive boxer's stance and yelling, "You are going to
do it my way, I ain't cuffin [sic] up."  (Id.)  Plaintiff continued "moving back and forth in a
fighters [sic] stance, fists raised and clinched ready to strike at any CO who came close."
(Id.)  Defendant Yurkiewicz then states that "from behind Bailey, I used a control technique
by kicking at the back of Bailey's right knee.  Bailey went off balance and gave the other
officers time to take the inmate to the ground.  Bailey was placed in cuffs and escorted off
the block."  (Id.)

Defendant Lorady echos that after Plaintiff "refused numerous orders to be
handcuffed, he took a boxer-type stance and came at staff in an aggressive manner."
(Employee Incident Report, Doc. 41, at 13.)  He also reports that Plaintiff was physically
subdued and placed on the floor and restrained.  "During the altercation, inmate Bailey
kicked CO Kintzel in the left leg.  Inmate Bailey was escorted to Main Control and placed in
a Holding Cell in the Property Room."  (Id.)

Following the incident, Plaintiff was taken to the medical department.  He informed
the doctor that he had just been assaulted and was suffering from numbness in his right wrist
and pain in his right shoulder.  An examination revealed that there was no sign of injury to
the right wrist and that circulation to the shoulder was "good."  (Medical Incident/Injury
Report, Doc. 41, at 17-18.)

On January 20, 2005, a hearing on Misconduct #A651058 was held.  At that time,

4

Plaintiff argued that he was assaulted by the officers.  The hearing examiner made the following findings of fact:

> Inmate pleads not guilty and submits a witness form, but no version form
>
> States that he was assaulted.  He never refused any orders and never kicked any officer's [sic].
>
> I find for the officers' [sic] report over the inmate's denial that he did refuse an order to be cuffed and did kick the officer in the leg, assaulting him.  I find him guilty of both charges.

(Id. at 19.)  He received a sanction of ninety days of disciplinary custody on each charge, effective January 14, 2005 through July 13, 2005.  On that same date, a hearing was also held on Misconduct #A648152 and Plaintiff was found guilty of possession of contraband.  (Doc. 41, at 27.)  The only sanction imposed was revocation of the contraband.

In response to Plaintiff's allegations that he was physically abused by Defendants Yurkiewicz, Kintzel, Beach and Greco during the cell search, Defendant Durant directed Lieutenant Barnes to conduct an investigation.  (Investigative Report of Lieutenant Barnes, Doc. 41, at 20.)  (Id.)  Lieutenant Barnes began by interviewing Plaintiff, who claimed that "for no apparent reason, Sgt. Yurkiewicz punched him and CO's Greco and Beach slammed him on the ground as CO Kintzel punched him in the ribs.  Inmate Bailey alleges he was then cuffed and drug away.  Inmate Bailey requested this officer interview Inmate Kennedy, Stephen, FY-9499, as he was Inmate Bailey's cellmate at the time of this incident."  (Id. at 21.)  The interview of Inmate Kennedy revealed the following:

> Inmate Kennedy stated the officers came to the cell to do a cell search.  "The

officers did a strip search on us but when Bailey approached the officer, the dog
started barking at him." Inmate Kennedy stated at that time inmate Bailey became
very agitated so Sgt. Yurkiewicz ordered Bailey to cuff up. Bailey refused, took
up a boxing stance and told the officers that he wanted a white hat here or they
would have to do it his way. Inmate Kennedy stated the officers then took him
down, cuffed him and took him away.

(Id. at 22.) Lieutenant Barnes interviewed staff members Kintzel, Yurkiewicz, Greco, Beach,

Alshefski, and Hughes. All staff members' versions of the incident were substantially

similar to the information contained in the Misconduct Report.

He also received memorandums from several individuals. For instance, Defendant

Kintzel recounted the events as set forth in his misconduct report and stated that "at no time

did this reporter use any unnecessary force while taking control of inmate Bailey." (Doc. 41,

at 15.) Defendant Beach also authored a memorandum to Lieutenant Barnes stating that "on

1-14-05 this officer helped Sgt Yurkiewicz, Co Kintzel handcuff Bailey, Demetrius CP 7816

[sic]. At no time was any abuse or excessive force used." (Id. at 16.) In addressing the

allegation of abuse, Sergeant Lauffer described the events as follows:

While assigned as A-Block Sgt. On 1/14/05, I was conversing with Sgt. Sisko
(Main Control) *via* telephone, I observed inmate CP 7819 Bailey standing on the
tier in front of his cell. He was clearly agitated and was arguing with Co Kintzel
and Co Yurkiewicz who were conducting a random cell search utilizing the drug
dog.

I directed Co's Alshefski and Hughes to report to the area and assist the search
team if needed. As they approached Baily [sic] raised both fists and squared off
to the officer, taking an aggressive stance.

I advised Sgt. Sisko that assistance was needed. As inmate Baily [sic] moved
toward one of the officers he was restrained by the other officers and escorted off
of the housing unit

6

I did not observe any use of excessive force or any actions that would support allegations of abuse.

(Doc. 41, at 14.)

Lieutenant Barnes concluded that "[f]rom all reports it is evident Inmate Bailey refused to cooperate with staff during the search of his cell. Inmate Bailey's actions were unjustified and, as a result, force was necessary to control the situation. From all testimony gathered, this reporter believes that all officers involved acted professionally and within established policy and procedures." (Investigative Report of Lieutenant Barnes, Doc. 41, at 20.)

The Pennsylvania Department of Corrections Office of Professional Responsibility reviewed the investigative report in accordance with the "Inmate Abuse Allegation Monitoring Program" and determined that the investigation was satisfactorily completed. (Office of Professional Responsibility Memorandum, Doc. 41, at 24.)

Plaintiff submits a declaration stating that "On 1-14-05, Defendants searched [his] cell for drugs and none was found and Plaintiff requested the (Capt. Lorady) white shirt but was denied and the Defendants assaulted Plaintiff with unnecessary excessive force without justification but out of retaliation for complaining." (Doc. 42, at 1, ¶ 3.) He also states that fabricated misconducts were initiated to cover-up the assault and unnecessary use of force against him. (Doc. 13, at 6, ¶ 12.)

B.    March 18, 2005 Misconduct

On March 18, 2005, Plaintiff was issued Misconduct #A648408 for "#26 Any

7

criminal violation of the Pennsylvania Crime Code" and "#40 Unauthorized Use of the Mail

or Telephone." (Doc. 41, at 7.)  The reporting officer was Defendant Sheriff.  The

misconduct was issued as a result of an investigation into the January 4, 2005, letter, which,

as stated above, prison officials believed contained statements that indicated that Plaintiff

was seeking to have illegal drugs introduced into the institution.  In finding Plaintiff guilty of

the charged conduct, the hearing examiner, Defendant Kane, stated as follows:

> . . . I do find that he wrote the attached letter in which he tells the person the letter
> was sent too [sic] make sure she gets balloons 25 to 30 of them and to make sure
> that they are only the size of a quarter.  I do find that this is Bailey's attempt, thru
> the mail, to conspire with "Belly", to introduce contraband into the institution
> when she comes up to visit.  It is common for drugs to be placed in balloons the
> size of a quarter in order to get them into the institution. . . . I find him guilty of
> both charges.

(Doc. 41, at 8.)  He was sanctioned to ninety days of disciplinary segregation effective from

July 13, 2005 through October 10, 2005.  (Id.)

## II.    Standard of Review

"Summary judgment serves as a minimal but important hurdle for litigants to

overcome before presenting a claim to a jury." Pappas v. City of Lebanon, 331 F. Supp. 2d

311, 314 (M.D. Pa. 2004).  Faced with such a motion, the adverse party must produce

affirmative evidence, beyond the disputed allegations of the pleadings, in support of the

claim. FED. R. CIV. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

Corneal v. Jackson Twp., 313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), aff'd, 94 Fed. Appx. 76

(3d Cir. 2004).  "Such affirmative evidence--regardless of whether it is direct or

circumstantial--must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)). Only if this burden is met can the cause of action proceed. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see FED. R. CIV. P. 56(c), (e).

We recognize that at this stage we must draw "all justifiable inferences" in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). This requires a distinction between evidence of disputed facts and disputed matters of professional judgment. "In respect to the latter, our inferences must accord deference to the views of prison authorities. Overton [v. Bazzetta, 539 U.S. 126 (2003)]. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." Beard v. Banks, 548 U.S. 521, 530 (2006).

## III.   Discussion

### A.   Eighth Amendment

Plaintiff claims that Defendants used excessive force during the January 14, 2005, cell search. The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The cruel and

unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." Id. at 346 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)). To state a claim under the Eighth Amendment, an inmate must satisfy an objective element and a subjective element. Farmer v. Brennan, 511 U.S. 825, 834 (1994). The objective element, which is responsive to "contemporary standards of decency," questions whether the deprivation of a basic human need is sufficiently serious. Hudson v. McMillian, 503 U.S. 1, 8 (1992); Wilson v. Seiter, 501 U.S. 294, 298 (1991). The subjective component, which flows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," asks whether the officials acted with a sufficiently culpable state of mind. See Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297 (internal quotation marks, emphasis, and citations omitted)); Rhodes, 452 U.S. at 345. What is necessary to establish an unnecessary and wanton infliction of pain varies according to the nature of the alleged constitutional violation. Hudson, 503 U.S. at 5.

Where the claim is one of excessive use of force, "the core judicial inquiry" as to the subjective component is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Id. at 9. In such cases, a prisoner may prevail on an Eighth Amendment claim even in the absence of a serious injury, so long as there is some pain or injury and something more than *de minimis* force is used. Id. at 9-10 (finding that

10

blows which caused bruises, swelling, loosened teeth, and a cracked dental plate were not *de minimis* for Eighth Amendment purposes).

In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) efforts made to temper the severity of a forceful response. Smith v. Mensinger 293 F.3d 641, 648-49 (3d Cir. 2002); Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000). Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Hudson, 503 U.S. at 9-10.

Defendants argue that the response to Plaintiff's behavior on January 14, 2005, was professional, according to policy, and necessary. (Doc. 40, at 7.) In support of their position they note that the strip search of Plaintiff was conducted after a search dog indicated that Plaintiff possessed drugs. Following the strip search, because Plaintiff was becoming agitated, it was determined that he needed to be handcuffed for safety reasons. However, he repeatedly ignored orders to be handcuffed and was becoming increasingly agitated. He then moved in an aggressive manner toward Defendants. They contend that a control technique was necessary to throw him off balance and subdue him so that they could restore order and that "there was nothing malicious or sadistic about the Defendants' actions, and there was no

11

attempt to cause Plaintiff harm." (Id.)

In opposition, Plaintiff states "for Defendants to assault Plaintiff by punching him in the head, ribs, lower back, knees, and twisting the arms, wrists, ankles to cause pain violated the 8th Amendment." (Doc. 42, at 6.)

Based on the record, it is concluded that Defendants acted in a good faith effort to restore order and security to the institutional environment, and that the force used to accomplish this end was not excessive. It is consistently reported in the extraordinary occurrence/incident report, misconduct report, the investigation interviews, and memos, that the K-9 dog indicated that Plaintiff may have had drugs. This necessitated a strip search. Defendants unanimously state that, following the strip search, Plaintiff was becoming increasingly agitated so, for security reasons, a decision was made to place him in handcuffs. He repeatedly refused orders to be handcuffed and began making aggressive moves. Defendants deemed it necessary to employ a control technique to knock Plaintiff off balance so he could be brought to the ground and handcuffed.

Also, at the urging of Plaintiff, during the investigation into his allegations of staff abuse, a statement was obtained from his cell mate, Inmate Kennedy, who was present at the time. Ironically, Inmate Kennedy's description of what unfolded on that day, specifically, the fact that Plaintiff was becoming increasingly agitated, and the manner in which he was brought to the ground, placed in hand cuffs and escorted off the block, is a mirror image of the version of the events set forth in the various DOC documents, not Plaintiff's.

Conversely, in his statement of facts, Plaintiff states that his "injuries support the unnecessary excessive force by Defendants for exercising a valid right, a jury could find that Defendants acted not merely in good faith to maintain or restore discipline, but rather out of malice for the very purpose of causing harm." (Doc. 42, at 3.) Unfortunately, this statement has no support in the record. Although escorted to the medical department shortly after the incident, he failed to notify the examining physician that he suffered injuries consistent with a beating that, as alleged in his complaint, included punching him in the head, ribs, lower back, knees, and twisting his arms, wrists, ankles. (Doc. 13, at 5, ¶¶ 5-8, 10.) Rather, he only complained of numbness in his right wrist and pain in his right shoulder. (Doc. 41, at 17-18.) Significantly, no treatment was rendered because no injuries were detected during the physician's examination and he was released and escorted to the Restrictive Housing Unit. (Id.)

It is clear from the record that based on the threat as perceived by the officers, there was a need for the application of force. Also, as evidenced by the fact that no injuries were detected by the examining physician, the amount of force was tempered and appropriate. Accordingly, Defendants are entitled to an entry of summary judgment on this claim.

B.     First Amendment

1.     Monitoring Mail

Plaintiff claims that his First Amendment rights were violated when Defendants opened, read, and tampered with his mail. The Supreme Court cases of Turner v. Safley, 482

13

U.S. 78 (1987), and <u>Overton</u>, 539 U.S. 126, outline the contours of a prisoner's First Amendment rights. <u>See</u> <u>Beard v. Banks</u>, 548 U.S. 521, 528 (2006). While imprisonment does not deprive a prisoner of the First Amendment's protection, it sometimes permits a contraction of the rights afforded outside prison walls. <u>See</u> <u>id.</u> Although prisoners retain a constitutionally protected right to reasonable correspondence with the outside world, <u>see</u> <u>Procunier v. Martinez</u>, 416 U.S. 396, 418 (1974), overruled on other grounds, 490 U.S. 401 (1989), under <u>Turner</u>, restrictive prison regulations are permissible if they are "reasonably related to legitimate penological interests." <u>Turner</u>, 482 U.S. at 89. Once a plaintiff has demonstrated that a constitutionally protected interest is at stake, as is the case here, <u>Turner</u> sets out a four-factor test to determine the reasonableness of the regulation. <u>Id.</u> at 89-90. The Turner test requires that:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and this connection must not be so remote as to render the policy arbitrary or irrational. Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests.

<u>DeHart v. Horn</u>, 227 F.3d 47, 51 (3d Cir. 2000) (internal quotations and citation omitted). Substantial deference must be given to prison administrators' judgment. <u>Overton</u>, 539 U.S. at 132. While plaintiffs bear the overall burden of persuasion, <u>id.</u>, prison administrators are required to demonstrate a rational connection between the policy and the alleged interest,

14

which "'must amount [ ] to more than a conclusory assertion.'" Jones v. Brown, 461 F.3d 353, 360 (3d Cir. 2006) (quoting Wolf v. Ashcroft, 297 F.3d 305, 308 (3d Cir. 2002) (internal quotations omitted)).

Under the first Turner prong, which requires that there be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, the court accords great deference to the judgments of prison officials "charged with the formidable task of running a prison." O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987). Certain restrictions are justified by the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security. DeHart, 227 F.3d at 50-51. The memorandum in which prison officials requested permission to monitor Plaintiff's mail sets forth a valid, rational connection between the administrative directive and legitimate penological objectives. The memorandum indicates that intelligence reveals that Plaintiff is trying to introduce contraband and drugs into the facility. The administrative directive provides for the monitoring of non-privileged correspondence if criminal activity is suspected or if the security of the institution may be compromised.

With respect to the remaining prongs, each of which considers accommodating the right at issue, although he may have a right to correspond with the outside world, he certainly has no right to engage in criminal activity and compromise the secure and orderly running of a state correctional institution. Defendants are entitled to an entry of summary judgment on this claim.

2.    *Retaliation*

To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

"As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected." Rauser, 241 F.3d at 333; see also, Jerry v. Williamson, 211 Fed. Appx. 110, 112 (3d Cir. 2006).  While inmates "do not forfeit all constitutional protections by reason of their conviction and confinement including those under the First Amendment . . . , lawful incarceration brings about withdrawal or limitation of privileges and rights for various reasons, including constitutional security." Cooper v. Tard, 855 F.2d 125, 128 (3d Cir. 1988); see also, Pell v. Procunier, 417 U.S. 817, 822 (1974) (stating that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system").

a.    Tampering with Mail

Plaintiff alleges that Defendants opened, read, and tampered with his mail in retaliation for complaining about being assaulted on January 14, 2005, and for filing

16

grievances about the incident.[2]  The First Amendment offers protection for a wide variety of

expressive activities.  See U.S. Const. amend I.  Prisoners retain a constitutionally protected

right to reasonable correspondence with the outside world.  See Procunier v. Martinez, 416

U.S. 396, 418 (1974), overruled on other grounds, 490 U.S. 401 (1989).  Retaliation for

expressive activities can infringe upon an individual's rights under the First Amendment.

See Allah, 229 F.3d at 224-25.

With regard to whether he was engaged in protected activity, he contends that his

complaints and filing of a grievance about the January 14, 2005 "assault" constituted

protected conduct.  The filing of a grievance clearly falls within the ambit of the First

Amendment.  See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).

With respect to the adverse action, Plaintiff contends that because he complained that

staff assaulted him during the January 14, 2005 incident, Defendants opened, read, and

tampered with his mail.  Official actions are considered "adverse" if they would be

"sufficient to deter a person of ordinary firmness from exercising his First Amendment

rights."  Allah, 229 F.3d at 225.  Clearly, such action in response to an allegation of staff

abuse would be considered adverse.

The third prong requires the prisoner to show "a causal link between the exercise of

his constitutional rights and the adverse action taken against him."  Rauser, 241 F.3d at 333.

---

[2]Plaintiff also alleges that he was assaulted for various reasons including, complaining about an illegal search of his cell.  However, given the above conclusion that Plaintiff was not assaulted, he cannot prevail on this claim and Defendants are entitled to an entry of judgment .

17

To demonstrate this link, the prisoner must prove that his constitutionally protected conduct was "a substantial or motivating factor" in the decision to take adverse action against him. Id. (citing Mount Healthy Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977)). Plaintiff fails to satisfy this prong. As noted in the statement of facts section, *supra*, permission to monitor and photocopy the non-privileged correspondence of Plaintiff was obtained on December 29, 2004. The action pre-dates the January 14, 2005 incident. Consequently, there is no causal link between the monitoring which began in December 2004, and his complaints and grievances stemming from the January 14, 2005, incident. Moreover, it is clear that permission to monitor the mail was granted based on the fact that the security office received intelligence that Plaintiff was planning the introduction of contraband and drugs into the prison facility.

b.    False Misconducts

Plaintiff's allegations that he was issued false misconduct reports does not constitute a violation of an inmate's constitutional rights. A prisoner does not have a constitutional right to be free from being falsely or wrongly accused of conduct. Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986). A purportedly false misconduct report does not give rise to the level of deprivation needed to constitute cruel and unusual punishment under the Eighth Amendment because they "are not 'sufficiently serious' that they result 'in the denial of the minimal civilized measure of life's necessities.' " Booth v. Pence, 354 F. Supp.2d 553, 558-59 (E.D.Pa. 2005) (citing Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir. 1997)). Nor

does it constitute a denial of due process under the Fourteenth Amendment. "[S]o long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim." See Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002).  However, allegations of being falsely charged with misconduct based on retaliatory motives generally satisfies the requirement that an inmate establish whether the actions purportedly taken in retaliation for this conduct are sufficiently "adverse" to constitute constitutionally cognizable infringements. See Smith, 293 F.3d at 653 (finding that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment).

Even assuming that Plaintiff has satisfied all three prongs, Defendants are entitled to summary judgment because they have established a legitimate penological purpose for their actions.  Once the three elements are met, the burden shifts to the defendant to prove by a preponderance of the evidence that the same action would have been taken even in the absence of the protected activity.  Id. (quoting Mount Healthy Bd. of Ed., 429 U.S. at 278). Because of the "deference" courts should afford prison officials, "prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. Defendants have established that the same action would have been taken in the absence of the protected activity for reasons related to the security of the institution.  Plaintiff is unable to prevail on this claim.

D.     Due Process

Plaintiff's contentions that his due process rights were violated in the context of

misconduct hearings requires a determination of whether he had a protected liberty interest

and, if so, what process was mandated to protect it.  See Sandin v. Conner, 515 U.S. 472, 484

(1995); Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).  Importantly, due process

requirements apply only when the prison's actions impose "an atypical and significant

hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S.

at 483 (1995).  "[T]he baseline for determining what is "atypical and significant"—the

"ordinary incidents of prison life"—is ascertained by what a sentenced inmate may

reasonably expect to encounter as a result of his or her conviction in accordance with due

process of law." Griffin, 112 F.3d at 706 (quoting Sandin, 515 U.S. at 486).

Confinement in administrative or punitive segregation is insufficient, without more, to

establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty

interest. Sandin, 515 U.S. at 486; see Griffin, 112 F.3d at 706-07 (finding that fifteen month

period of administrative custody did not deprive prisoner of a liberty interest). The

disciplinary sanctions at issue, two consecutive ninety day periods of disciplinary

segregation, effective January 14, 2005 through July 13, 2005, and a separate, unrelated

ninety day period of disciplinary segregation, effective July 13, 2005, through October 10,

2005, do not constitute "an atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life." Sandin, 515 U.S. at 483.  Hence, Defendants are entitled to

20

an entry of judgment on Plaintiff's due process claim.  Buckley v. Barlow, 997 F.2d 494 (8th

Cir. 1993));  Wilson v. Horn, 971 F. Supp. 943, 947 ( E.D. Pa. 1997).

**IV.    Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment will be

granted.

An appropriate order will issue.

**BY THE COURT:**

**s/James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

Dated: September 29th, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEMETRIUS BAILEY, | : | CIVIL NO. 3:CV-06-1707 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| JEFFREY BEARD, et al., | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, to wit, this 29th day of September 2008, in accordance with the foregoing memorandum, it is hereby **ORDERED** that:

1.    Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Doc. 38) is GRANTED.

2.    The Clerk of Court is directed to ENTER judgment in favor of Defendants and against Plaintiff.

3.    The Clerk of Court is further directed to CLOSE this case.


**BY THE COURT:**


s/James M. Munley
**JUDGE JAMES M. MUNLEY**
**United States District Court**